CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 29 2013

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| KATHY S. HOOVER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 5:11cv00106 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Michael F. Urbanski |
| Commissioner of Social Security, | ) United States District Judge |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This social security disability appeal is before the court for review of the Report and Recommendation issued in this case by the magistrate judge, in which it is recommended that plaintiff Kathy Hoover's motion for summary judgment be granted, that the final decision of the Commissioner be reversed, and that this matter be recommitted to the Commissioner for the calculation and payment of benefits. The Commissioner has filed an objection to the Report and Recommendation pursuant to Federal Rule of Civil Procedure 72(b). For the reasons set forth below, the court finds the majority of the Commissioner's objections to the Report and Recommendation to be well-taken, but also finds it prudent to remand this matter to the Commissioner for further consideration. As such, the recommendation that the Commissioner's decision be reversed will be rejected and an Order remanding the case to the Commissioner for further consideration will be entered.

I.

Hoover filed an application for disability insurance benefits on April 21, 2009, alleging a disability onset date of September 1, 2008. The Commissioner denied her application for benefits initially and again on reconsideration. An administrative hearing was held on April 21, 2011. In a decision issued on May 27, 2011, the administrative law judge (ALJ) determined that

Hoover had severe impairments consisting of the following: degenerative changes of the cervical spine with radiculopathy, tricompartment arthrosis and a tear of the medial meniscus of the left knee, acromioclavicular joint hypertrophy and some morphology suggesting extrinsic impingement with associated minimal distal infraspinatus tendinosis of the right shoulder, and fibromyalgia. (Administrative Record, hereinafter "R.," 12.) Considering these impairments, the ALJ found that Hoover retained the residual functional capacity (RFC) to perform a limited range of light work, specifically finding that Hoover can stand and/or walk for two hours in an eight hour workday; sit for six hours in an eight hour workday; is limited with respect to pushing and pulling with the lower extremities; can climb ramps and stairs, kneel, stoop, and crawl occasionally; and can never climb ladders, ropes and scaffolds and balance. (R. 14.) Based on this RFC, the ALJ determined at step four of the sequential evaluation process, see 20 C.F.R. § 404.1520(a)(4), that Hoover could perform her past relevant work as a call center operator as it is typically performed in the national economy.[1] Alternatively, the ALJ determined at step five of the sequential evaluation process that there are other jobs that exist in significant numbers in the national economy that the Hoover can perform, such as information clerk and hand packer, both of which are classified as unskilled, sedentary work. Thus, the ALJ concluded that Hoover is not disabled under the Social Security Act. The Appeals Council denied plaintiff's request for review and this appeal followed.

This matter was referred to the magistrate judge for proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties filed cross motions for summary judgment and supporting memoranda, and the magistrate judge issued his Report and Recommendation on December 5, 2012. The magistrate judge concluded that final judgment should be entered in favor of Hoover in this case because the ALJ erred in three

---

[1] This job is classified as semi-skilled, sedentary work. (See R. 16-17.)

respects: 1) by finding Hoover has the residual functional capacity to perform light work with some limitations; 2) by dismissing Hoover's complaints of right arm difficulties; and 3) by finding Hoover does not have a severe mental condition. The Commissioner objects to all three of the magistrate judge's assignments of ALJ error. As outlined below, the court will sustain the Commissioner's objections to the first two findings by the magistrate judge. The issue concerning Hoover's mental impairments, however, warrants remand.

## II.

In determining Hoover has the RFC to perform a limited range of light work, the ALJ considered the opinion of Dr. Gregory Hardigree of RMH Valley Orthopedics and Sports Medicine, who treated Hoover's left knee impairment. Dr. Hardigree concluded on July 22, 2009, Hoover's initial appointment with him, "certainly I do not think there is any way [Hoover] can do a job that is not completely sit down." (R. 329.) The ALJ found Dr. Hardigree's opinion to be "highly credible." (R. 16.) Ultimately, however, the ALJ did not limit Hoover to sedentary work but instead to less than the full range of light work, relying on the opinion of the reviewing state agency physicians,[2] which the ALJ found to be "highly credible *and controlling.*" (R. 14, 16 (emphasis added).)

In his Report and Recommendation, the magistrate judge held that this RFC determination "directly conflicts with all of the medical testimony and, therefore, is not supported by substantial evidence." Report & Recommendation, Dkt. # 21, at 9. Specifically, the magistrate judge took issue with the ALJ's failure to explain why "on the one hand, he found the opinion of the only treating physician for plaintiff's knee impairment to be 'highly credible,' but, on the other, concluded that plaintiff possessed a residual functional capacity (RFC) which

---

[2] The reviewing state agency physician at the initial level of review noted Hoover's knee problems "would limit her to sed[entary] work," but determined that she had the RFC for a reduced range of light work, just as the other reviewing state agency physician found upon reconsideration. (R. 159-62.)

3

was inconsistent with his credibility determination." Id. The Commissioner argues that there is no conflict here, and the court agrees.

The ALJ took into account Dr. Hardigree's opinion in limiting Hoover to less than a full range of light work. Light work generally "requires a good deal of walking or standing. . . ." 20 C.F.R. § 404.1567(b). The ALJ determined that Hoover could only stand and/or walk for 2 hours in an eight-hour workday.[3] He plainly credited Dr. Hardigree's finding that plaintiff's knee impairment significantly impacted her ability to stand and walk during the day and appropriately limited Hoover's RFC in that regard. The ALJ's adoption of the reviewing state agency physicians' RFC determination, which was based in part on the opinion of Dr. Hardigree, does not create a conflict with the record evidence.

Moreover, the jobs that are available to Hoover according to the vocational expert's testimony, given the fact that she is limited to less than the full range of light work, are jobs performed at the sedentary level of exertion.[4] Indeed, the ALJ determined at step four that Hoover could perform her past relevant work as a call center operator, which is sedentary work as it is typically performed in the national economy.[5] (R. 16.) Additionally, the ALJ determined alternatively at step five that other jobs exist in the national economy that Hoover can perform, namely information clerk and hand packer, both of which are sedentary.

Thus, there is no conflict between the ALJ's RFC assessment and Dr. Hardigree's opinion. The Commissioner's objection to the magistrate judge's finding on this issue is sustained.

---

[3] The court notes that sedentary work involves "a certain amount of walking and standing" in order to carry out job duties. 20 C.F.R. § 404.1567(a).
[4] The magistrate judge acknowledged that any error was "mitigated somewhat by the fact that the [ALJ] determined plaintiff could perform past relevant sedentary work...." Report & Recommendation, Dkt. # 21, at 9.
[5] Plaintiff could not perform this work as she reportedly performed it at the light level because she was limited to less than the full range of light work. (R. 16.)

4

## III.

The magistrate judge also takes issue with the ALJ's credibility determination as it relates to Hoover's complaints of right arm difficulties. There was little testimony at the administrative hearing concerning Hoover's right arm. Hoover testified only that her arm gets numb and tingly (R. 30) and that she had to stop performing her part time job as a home attendant[6] because she woke up one morning with a bad headache and pain in her neck and right shoulder. (R. 29.) She did not testify as to any specific limitations—for example, the amount of weight she is able to lift and carry—stemming from her right arm impairment. In his report, the magistrate judge held that plaintiff's testimony concerning her right arm limitations is supported "by all the objective medical evidence" and that these limitations "certainly have their vocational effects." Report & Recommendation, Dkt. # 21, at 10, 11.

Hoover was referred by the Free Clinic to Dr. Danisa at RMH Valley Orthopedics and Sports Medicine, to whom she presented on September 2, 2009 with complaints of neck pain, an inability to hold her head up, and some right arm weakness. (R. 379.) Hoover complained of stiffness in her right arm, difficulty using her arm above her head, and numbness in her right arm and thumb. (R. 379.) Dr. Danisa's records note that a previous MRI showed multiple-level degenerative disc disease but no "significant stenosis or compression which would account for her pathology." (R. 379; see also R. 406.) Upon examination, Dr. Danisa noted obvious weakness in the right shoulder, as well as difficulty to abduct and externally rotate. (R. 379.) Dr. Danisa also noted Hoover exhibited "slightly bizarre behavior," and stated he was referring her for a neurological evaluation as well as a shoulder MRI. (R. 379.)

An MRI of her shoulder taken in September 2009 showed AC joint hypertrophy and some acromial morphology, suggesting an extrinsic impingement, as well as associated minimal

---

[6] The vocational expert testified that this job is performed at the medium exertional level. (R. 38.)

distal infraspinatus tendinosis. (R. 360.) In October, Hoover presented to RMH Neurology, complaining of worsening neck pain, weakness and muscle spasms in the right shoulder and numbness in the right upper extremity radiating across the shoulder and into the thumb and second digit. Limited physical examination revealed 4+ weakness of the right deltoid, biceps, and hand grip, as well as decreased sensation along the lateral arm and forearm. (R. 368.) Nerve conduction studies and an EMG needle examination performed on the right upper extremity revealed findings most consistent with: 1) an acute right cervical polyradiculopathy primarily affecting the C5, C6, and, to a lesser degree, C7 nerve roots; and 2) a mild, chronic right median mononeuropathy at the wrist (ie., carpal tunnel syndrome) with no features of active denervation. (R. 369-70.)

Hoover did not see Dr. Danisa again until January 20, 2010,[7] at which time she continued to complain of upper extremity numbness, tingling, dysethesias and right shoulder pain. (R. 380.) Dr. Danisa noted the MRI of Hoover's shoulder "came back positive for an extrinsic compression of the shoulder with AC joint arthritis," and that the nerve conduction study "show[ed] evidence of C5, C6 and C7 radiculopathy which seemed to be acute and also some mild carpal problems to correlate with [an MRI of Hoover's neck], which showed C5-6, C6-7, C7-T1 and C4-5 spondylosis, loss of lordosis." (R. 380.) Dr. Danisa noted that he talked to Hoover and "even offered her surgical intervention," but that she decompensated in his office and started crying saying she has "a lot of things going on and she cannot tolerate surgery at this time." (R. 380.) Dr. Danisa offered Hoover physical therapy, but she said she could not afford it; thus, he gave her some examples of shoulder exercises. (R. 380.)

---

[7] The court notes that in the intervening period, a physical examination at the emergency room revealed Hoover's strength was 5/5 in all extremities. (R. 350.)

Hoover saw Dr. Danisa again on May 14, 2010 for a follow-up of her shoulder and neck pain. His notes state: "The problem is her emotional and neuropsychiatric problems seem to predominate her problems. [When] I last talked to her, she decompensated in the office crying, said she did not want to have surgery and she comes in now still complaining of her symptoms. . . . I spoke to Ms. Hoover and basically she does have objective and organic problems, but these are far outweighed by her neuropsychiatric issues." (R. 472.) Dr. Danisa stated that upon examination, her strength was normal, and her sensory exam was normal, but she was "tremendously dysphoric." (R. 472.) He recommended that she "at least get over this acute episode," referring to her mental health state, and then he would "see what we can do for her." (R. 472.)

While the objective medical evidence certainly establishes the existence of an impairment that could cause pain in Hoover's right upper extremity, as the ALJ properly noted (R. 15), the record evidence does not support a finding that Hoover's right arm pain is disabling. See Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996) ("[A]fter a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, [] the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." (emphasis omitted)). The ALJ considered Hoover's "acromioclavicular joint hypertrophy and [] morphology suggesting extrinsic impingement with associated minimal distal infraspinatus tendinosis of the right shoulder," as well as her fibromyalgia, to be severe impairments. (R. 12.) He took these impairments into account in fashioning an RFC which limited Hoover to lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). There is nothing to suggest that Hoover's right arm pain prevents her from performing this level of exertion.

7

In assessing the degree of Hoover's alleged pain and limitations, the ALJ noted that Hoover had worked part-time as a caregiver for approximately three months after her alleged onset date, which work was classified by the vocational expert as medium work.[8] As to her job duties, Hoover testified the work involved:

> Taking care of a lady with MS in a wheelchair.[9] So, I had to lift her to take her to the bathroom and lift her to put her back in her chair. I would feed her, help her with anything she needed. I would clean up the house, which was a job in itself because they got a big house. So, I would have to stop and go, stop and go because it was too much, but mostly take care of her.

(R. 28-29.) The fact that Hoover claims to have left this job because of her right arm pain does not mean Hoover cannot perform work at a less demanding exertional level.

ALJ further considered the fact that Hoover declined surgical intervention on her right shoulder in assessing the degree of her alleged pain. The magistrate judge faults the ALJ for his consideration of this fact, asserting a claimant "must be given a full opportunity to express the specific reasons for [her] decision not to follow the prescribed treatment," Report & Recommendation, Dkt. # 21, at 10 (citing Nunley v. Barnhart, 296 F. Supp. 2d 702, 704 (W.D. Va. 2003)), and holding the ALJ "does not appear to have considered either the plaintiff's mental condition or financial condition in assessing whether her alleged noncompliance with the recommendation of surgery was reasonable." Id. Contrary to the magistrate judge's assertions, however, the ALJ did not base his disability decision on Hoover's failure to follow prescribed treatment; he merely considered the fact that she declined surgery on her right shoulder in assessing her credibility in terms of her alleged pain. Additionally, Hoover testified at the administrative hearing as to why she declined shoulder surgery: "I was anxious about it, just didn't want to go through all the pain and the recovery that entails with it that is so painful. I

---

[8] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.
[9] The record indicates that this woman weighed approximately 120 pounds. (See R. 416.)

8

mean, I hurt all the time and I just didn't want it to be more." (R. 30.) This testimony does not indicate her mental or financial condition influenced her decision not to proceed with surgery.

The magistrate judge also notes that the vocational expert testified at the administrative hearing that Hoover "would not be capable of performing her past relevant work or any jobs available in the national economy" if she had "difficulties using her dominant right-arm." Report & Recommendation, Dkt. # 21, at 10. The specific question posed to the vocational expert was:

> Q. If she were to have difficulties, say 25 percent or more of the time during the day, with her right hand, using her right arm, would those jobs you listed be available?
>
> A. No sir.

(R. 41.) The vocational expert did not testify that any difficulty with her right arm would preclude Hoover from working; he testified in response to this specific question from counsel that no jobs would be available to Hoover if she had difficulty using her right arm 25 percent or more of the workday. There is no evidence in the record to support the degree of limitation posed to the vocational expert in this hypothetical.

The court simply finds no reason to disturb the ALJ's credibility determination in this case. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. Melvin v. Astrue, No. 6:06cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007) (citing Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir.1989)). Therefore, the court sustains the Commissioner's objection to the Report and Recommendation as to this issue.

### IV.

Finally, the magistrate judge recommends entering judgment in plaintiff's favor in this case because the ALJ's finding that Hoover does not have a severe mental condition is not

9

supported by substantial evidence. Indeed, the ALJ did not find any mental impairment, including Hoover's documented bipolar disorder, to be severe. Under the regulations, an impairment is considered "severe" when it significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1521(a); see also 20 C.F.R. § 404.1520(c). Basic mental work activities include capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). Impairments must also last or be expected to last for a continuous period of at least twelve months to qualify as severe. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii); see also 42 U.S.C. § 423(d)(1)(A).

In finding Hoover's mental impairments not to be severe, the ALJ adopted the opinions of the reviewing state agency physicians. (R. 15.) The problem, however, is that these opinions were rendered before many of the mental health treatment notes in the record were generated. At the time of the reviewing physician's initial review on August 19, 2009, Hoover was being treated for her mood disorder with medication by her primary care physician. (R. 159.) In the opinion rendered at the reconsideration level of review on March 24, 2010, the reviewing physician noted that Hoover had "some mild increase[] in depression"[10] but "no psy[chiatric or psychological] treatment beside[s] medication." (R. 188.) A few weeks later, on April 7, 2010, Hoover was admitted to the hospital for five days for increased depression and suicidal ideation. (R. 496-518.) Her Global Assessment of Functioning (GAF) was determined to be 38, and her highest level of functioning in the past year was noted to be 59.[11] The overall severity of her

---

[10] Hoover was hospitalized in October 2009 for depression and suicidal ideation. (R. 339-58.)
[11] The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social and occupational functioning on a hypothetical continuum of mental health illness. Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Rev.2000) (hereinafter "DSM–IV–TR"). A GAF of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) or major

10

illness was said to be "moderately severe." (R. 500.) She also presented to the emergency room in May of 2010 complaining of depression after starting to "cut herself." (R. 484-95.) During that visit, she was not admitted to the hospital, and the overall severity of her illness was noted to be mild. (R. 488.) Still, the reviewing state agency physicians did not have the benefit of these records in considering the impact of Hoover's mental health on her ability to work. Nor did they have the benefit of reviewing records of Hoover's subsequent mental health treatment through the Community Services Board. (R. 422-58.)

The Commissioner correctly points out in his objections that "an ALJ's omission of an impairment at step two is harmless if the ALJ resolves that step in the claimant's favor and considers any limitations from that impairment (and any other medically determinable impairments) at the subsequent steps of the sequential disability evaluation." Comm'r Objections, Dkt. # 23, at 8; see Miller v. Astrue, No. 8:10-1142-HMH-JDA, 2011 WL 1576203, at *15 (D.S.C. Apr. 7, 2011), adopted in 2011 WL 1561058 (D.S.C. Apr. 26, 2011). The issue here is that the ALJ did not adequately consider limitations from Hoover's mental impairments in the subsequent steps of the analysis. To be sure, the ALJ discussed Hoover's bipolar disorder in his decision. Citing Global Assessment of Functioning (GAF) scores of 52, 55, and 60 found in the record, the ALJ held Hoover's mental condition improved significantly with treatment, stating:

> [I]t is the opinion of the Administrative Law Judge that as a result of her mental impairment, the claimant would be limited to work involving understanding, carrying out, and remembering simple instructions, using judgment, responding appropriately to supervision, coworkers, and usual work situations, and dealing with changes in a routine work setting. With these limitations,

---

impairment in several areas, such as work or school, family relations, judgment, thinking or mood. A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

> pursuant [to] 20 C.F.R. § 404.1521(b) and 416.921(b), this impairment, with treatment, is not a severe impairment.

(R. 13.) While this language seems to suggest that Hoover's mental condition somehow limits her ability to work and the ALJ took those limitations into account, the ALJ is simply reciting the definition of "basic work activities" from the regulations, see 20 C.F.R. § 404.1521(b), saying only that Hoover's mental impairments are not severe. See id. at § 404.1521(a) ("An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

The ALJ again considered Hoover's mental impairments in his credibility analysis, stating: "The claimant alleges that she is severely limited by her mental impairments. However, as noted above, the medical evidence establishes that these impairments improved significantly with treatment, resulting in GAFs of 55 to 60." (R. 15 (internal citations omitted)). This still means that Hoover suffered from moderate symptoms. Indeed, the record reveals GAF assessments that, at best, indicate the existence of moderate symptoms (see, e.g., R. 248 (GAF 45-50); 340 (current GAF 41, highest in past year 58); 351 (GAF 40); 463 (GAF 49); 469 (GAF 50); 488 (GAF 55, in past year 60)), even when it was specifically noted that Hoover was being compliant with medication (see, e.g., R. 435-36 (noted to be compliant with medications on July 1, 2010; GAF assessed at 52, 60 in the past year, on July 6, 2010)).

Despite the ALJ's acknowledgment that Hoover exhibited moderate symptoms, he goes on to find only mild limitations stemming from those symptoms, without any further explanation: "As a result, it is the opinion of the Administrative Law Judge that the claimant exhibits mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation." (R. 13.) As a result, the ALJ did not include any mental limitations in his

RFC assessment. The Commissioner correctly points out that the ALJ did consider her mental impairments at step five, stating that even if the limitations from Hoover's mental impairments prevent her from performing her past relevant work as a call center operator (a semi-skilled job), they do not bar her from performing other unskilled occupations. But this is the only reference by the ALJ to any mental limitation.

Given the number of references in the medical records to concerns over Hoover's mental health, the court cannot find that substantial evidence supports the ALJ's consideration of Hoover's mental impairments and the impact they might have on her ability to work. A more thorough examination into the limitations caused by Hoover's mental impairments is warranted. On remand, the Commissioner is directed to obtain a consultative examination of the claimant's mental impairments to assess their impact on her ability to work.

## V.

In sum, the court cannot agree with the magistrate judge that reversal is appropriate here. Accordingly, an Order will be entered rejecting the recommendation that this case be reversed and remanding this matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration as set forth above.

An appropriate Order will be entered.

Entered: March 29, 2013.

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge